UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

KENDELL SEATON,                            )
                                           )
        Plaintiff,                         )
                                           )        No. 5:16-CV-309-REW
v.                                         )
                                           )        OPINION, ORDER,
                                           )        FINDINGS OF FACT, and
SONNY PERDUE, in his official              )        CONCLUSIONS OF LAW
capacity as Secretary, United States       )
Department of Agriculture,                 )
                                           )
        Defendant.                         )

*** *** *** ***

In this ADEA action, Plaintiff Kendell Seaton claims that, in 2010, USDA Rural Development (RD) Kentucky State Director Tom Fern ignored Plaintiff's superior credentials and picked Barry Turner (12 years Seaton's junior) for the London, Kentucky Area Director position because he wanted a younger man for the job. This matter is now before the Court on summary bench trial briefing.

I.      INTRODUCTION

        a. Factual Overview

Seaton's Background

Kendell Seaton, age 63 during the relevant events, *see* DE 38-1 at 145 (EEOC Report), began working for RD's predecessor agency, Farmers Home Administration ("FHA"), in 1970. DE 56-1 at 24 (Seaton Resume). He worked for FHA in the Commonwealth as an Assistant County Supervisor, County Supervisor, and Business & Industrial Loan Specialist. Seaton also worked for several years ('75-'77) at FHA's

national office in D.C. *Id.* During his time in Washington, Seaton obtain an M.A. in Applied Public Financial Management from American University. In 1981, the first President Bush appointed Seaton as Kentucky FHA Director. Seaton's tenure as Director ended in 1987 when he resigned after being indicted on federal charges stemming from acceptance of improper benefits *See* DE 22 (Seaton Dep.) at 30–31 ("I decided to plead guilty to one count of accepting a gift that I wasn't entitled to."). For the 2+ decades after his resignation and prior to applying for RD's London Area Director position, Seaton worked as a realtor in Lexington, Kentucky. DE 56-1 at 20–21.

<u>Turner's Background</u>

Barry Turner, age 51 during the relevant period (DE 38-1 at 144), had roughly two decades of experience at RD prior to his selection. DE 55-1 at 48. A graduate of Berea College, *id.* at 49, and then-current RD employee, Turner:

> [H]ad come up through the ranks as an assistant county supervisor, county supervisor, area specialist. He was very knowledgeable about the programs. . . . I mean, the communication systems, the computers that we used, the programs that were used . . . in those systems. He [ ] was from the local area. He knew th[e] stakeholders, our customers in the local areas, and his recentness of his experience was . . . considered to be [ ] a strength.

DE 24 (Kostelnik Dep.) at 70–71.

<u>The Initial Selection</u>

In 2009, both Seaton and Turner applied for the London, Kentucky, Area Director position. This was a management slot with area-wide authority. Cheri Guadinier, RD's local HR Manager, scored all applicants—including Turner, who tied for last, and Seaton, who tied for first—based on objective criteria and compiled a "Certificate of Eligibles[.]" DE 55-1 at 41–42. The spread between first and last was only 5 points. *See* DE 23-3 at 2–

3. Then-Acting State Director Brown formed a selection committee—which included Brown, and Program Directors Tom Kostelnik, Linda Chadwell, Jeff Jones, and Paul Higgins—to consider the applicants. DE 38-1 at 4 (Report of Investigation). The panel unanimously recommended Seaton as the preferred candidate. DE 38-3 at 68–69; DE 55-1 (9/23/2009 Selection Certificate). Seaton's application went then to HR for processing and a background check. DE 38-1 at 5. Time passed and government gears slowly turned.

## Fern's Arrival, Position Cancellation & Reorganization

While Seaton's background check pended, in November 2009, President Obama appointed Tom Fern Kentucky RD Director. *Id.* at 4. Following two December 2009 and January 2010 meetings where Seaton's pending selection was heavily discussed, RD cancelled all open vacancy announcements in the state (including the London Director position for which Seaton was the selectee). DE 55-1 at 27 (1/15/2010 Letter to Seaton). The reason given: contemplated reorganization. *Id.* After several months, RD submitted a reorganization plan that did not impact the London office. *See* DE 56-1 at 2.

## The Final Selection

The Agency then reannounced the Area Director vacancy. *See* DE 56-1 at 36 (April 5, 2010, reannouncement). Seaton and Turner again applied. Fern, the new selector, first chose Turner from a Certificate of Eligibles that, through clerical error, omitted Seaton. DE 56-1 at 9. Fern claims his decision was principally driven by the recency and proximity (to the London office) of Turner's experience and background. *See* DE 38-4 at 13–15 (EEOC Hr'g Tr.). Once the mix-up was remedied, and Seaton's

name added, DE 56-1 at 12, Fern convened a committee[1] to approve or disapprove of the Turner pick. *See id.* at 13. The committee, no surprise, signed off on their boss's choice. *Id.* at 13. This suit, after a lengthy administrative process, followed.

### b. *Jurisdiction & Venue*

The Court has jurisdiction over the instant dispute pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 633a. Section 1331 grants district courts original jurisdiction in "all civil actions arising under" federal law. Section 633a(c) authorizes civil suits for alleged age discrimination by federal employers "in any Federal district court of competent jurisdiction[.]" Defendant is a federal employer, and Plaintiff claims age discrimination as to a personnel action in this District. *See* DE 59 at 1. Accordingly, the Court has original jurisdiction.

Further, venue is proper in this District pursuant to 28 U.S.C. § 1391(b), which provides that an action may be brought where "a substantial part of the events or omissions giving rise to the claim occurred." *Id.* The Court's findings, below, detail the relevant events. For now, suffice it to say most critical events and key individuals trace to this District.

### c. *Posture*

The Court has already described the case's posture prior to dispositive motion consideration:

> Seaton, on February 11, 2010, contacted the EEOC and eventually, on April 29, 2010, lodged a formal complaint alleging, among other bases, age discrimination. DE 22-5 at 1 . . . . Plaintiff eventually brought his claim to a two-day, August 29 & 30, 2011, hearing before EEOC

---

[1] The initial selection and final concurrence committees had three overlapping members: Tom Kostelnik, Vernon Brown, and Jeff Jones. *Compare* DE 38-1 at 4, *with* DE 56-1 at 13.

Administrative Law Judge (ALJ) Davidson Momah. Judge Momah, though finding "the entire selection process very disturbing," concluded that "the record shows that age was not the real reason . . . for [Seaton's] nonselection." DE 38-5 at 19, 31 (March 28, 2012, decision). The agency adopted the ALJ's recommendation both initially, on October 23, 2013, and after completing its internal appeals procedure, on May 13, 2016. Seaton then filed this suit. . . . Judge Hood[, who had the case at one point,] substituted as Defendant Secretary Perdue for former-Secretary Vilsack and, under Rule 12, dismissed all named individual co-defendants. *See* DE 15 at 1 (Mem. Op. & Order).

DE 46 at 3–4. The Court, seeing genuine disputes over material facts, then denied Defendant's motion for dispositive relief. DE 46 (Op. & Order). The parties, after due consideration, consented to a summary bench trial, and the Court set a briefing schedule. DE 53 (Order). The case is now fully briefed, and the parties have agreed to a specific record scope. *See* DE 57 (Designation of Joint Exhibits); DE 58 & 59 (Trial Briefs); DE 63 & 64 (Responses). Having considered the full record, and under the applicable standards, the Court **FINDS** that Plaintiff, despite discrediting much of the defense's hiring tale, failed to preponderantly prove any age-driven decision making. Age was not the but-for cause of Fern's choice. Accordingly, the Court enters a separate Judgment consistent with the following reasoning and findings.

## II.      QUESTIONS PRESENTED

The case presents three principal questions: First, did Fern cancel the London Area Director vacancy because he honestly was considering moving that office? Second, did Fern pick Turner when that job was reannounced because he, after scrupulously comparing the candidates, preferred Turner's credentials? Finally, and most importantly, but for Seaton's age, would Fern have given him the job? The Court, for the following

reasons and under the preponderance standard,[2] answers each in the negative. The third is the one that really counts.

The Court first describes the legal standard, next conducts a *McDonnell Douglas* burden-shifting analysis, and finally assesses the ultimate question of discrimination. At bottom, the facts and law compel a result in Defendant's favor. Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes and memorializes the following findings of fact and conclusions of law.

## III.    FINDINGS & CONCLUSIONS

### a.  Legal Standard

The federal-sector ADEA provision requires that "personnel actions affecting employees or applicants . . . who are at least 40 years of age . . . be made free from any discrimination based on age." 29 U.S.C. § 633a(a). Seaton stakes his discrimination claim on this statute. *See* DE 59 at 7.

"To prevail on a claim under the ADEA, it is not sufficient for the plaintiff to show that age was a motivating factor in the adverse action; rather, the ADEA's . . . language requires that a plaintiff 'prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but-for' cause of the challenged employer

---

[2]      "Establish by a preponderance of the evidence" means evidence, which as a whole, shows that the fact sought to be proved is more probable than not. In other words, a preponderance of the evidence means such evidence as, when considered and compared with the evidence opposed to it, has more convincing force, and produces in your minds belief that what is sought to be proved is more likely true than not true. This standard does not require proof to an absolute certainty, since proof to an absolute certainty is seldom possible in any case.

3 Fed. Jury Prac. & Instr. § 104:01 (6th ed.); *see also Williams v. Eau Claire Pub. Sch.*, 397 F.3d 441, 446 (6th Cir. 2005) (approving trial court's use of instruction defining preponderance of the evidence as "such evidence as, when considered and compared with that opposed to it, has more convincing force and produces in your minds belief that what is sought to be proved is more likely true than not true").

decision.'"[3] *Scheick v. Tecumseh Pub. Sch.*, 766 F.3d 523, 529 (6th Cir. 2014) (quoting *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2351 (2009)).

    *b. Prima Facie Case*

    An ADEA plaintiff may establish a prima facie case via either of two evidentiary routes: direct or circumstantial. "The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348–49 (6th Cir. 1997). Seaton explicitly taps his claim for analysis under the circumstantial rubric. *See* DE 59 at 8 ("Plaintiff chose to establish his prima facie case through circumstantial evidence."). Thus, Plaintiff must satisfy "the familiar *McDonnell Douglas* burden-shifting framework." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 589–90 (6th Cir. 2014). Under this rubric, Seaton had to prove: "(1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) after he was rejected, a substantially younger applicant was selected." *Burzynski v. Cohen*, 264 F.3d 611, 622 (6th Cir. 2001). The defense does not argue that Seaton failed to establish a prima facie case. And rightfully so. Undisputed facts show that Seaton: (1) was over 60 years old during the relevant period, DE 38-1 at 145, (2) applied and was rejected for an RD position, DE 56-1 at 15 (7/13/2010 Letter to

---

[3] The Court, in denying summary judgment, thoroughly detailed the unsettled status of the burden applicable to a federal-sector ADEA claim and ultimately concluded that "but-for" rather than "motivating factor" causation is required. DE 46 at 7–10. The Court's initial finding was preliminary; however, the Court explicitly noted its expectation of "thorough advocacy if there is a dispute on the question." DE 46 at 9 n.4. The Court's prior analysis stands unchallenged. *See* DE 63 at 19; DE 64 at 1–2. Indeed, Plaintiff explicitly agrees that "but-for" causation is the appropriate standard. DE 59 at 7 n.2 ("Plaintiff agrees with the Court's analysis and conclusion."). Thus, the Court declines to retread undisputed ground, relies on the prior analysis, and applies the "but for" standard.

Seaton), (3) was, as RD itself twice found, qualified for the position, *id.* at 12; DE 55-1 at 45 (Selection Certificates), and (4) RD's ultimate choice, Turner, was 12 years Seaton's (thus substantially) junior. DE 38-1 at 144.

### c. Nondiscriminatory Rationale

Seaton's valid prima facie case shifts the burden to the defense "to articulate a legitimate nondiscriminatory reason for the adverse employment action." *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010). "[T]his burden is one of production only, not of persuasion." *Gray v. Toshiba Am. Consumer Prod., Inc.*, 263 F.3d 595, 599 (6th Cir. 2001). The Court's analysis on this topic remains (mostly) unchanged from the summary judgment stage:

> Defendant offers several ostensibly legitimate bases for Fern's choice of Turner over Seaton. Fern contends he gave Turner the nod based on his more recent (and London-based) experience, his close ties to the relevant stakeholders, and the positive reviews Turner received from coworkers and community members. [DE 38-4 at 13–15] (Fern EEOC [Hr'g Tr.]). Fern also explained *why* he felt these factors were meaningful. *See id.* at [15–16] ("The area director is . . . personally working hands on supervising those staff . . . . He's the leader . . . with all the stakeholders[.] . . . . [Turner] knew the people. . . . [H]e had a proven track record of working well with all the partners and stakeholders as well as his coworkers."). Fern contrasted Turner's credentials with Seaton being away from agency work for "approximately 22 to 23" years during which "the face of Rural Development has changed dramatically[.]" *Id.* at [16]. He further noted that Seaton's work history never placed him in the London area. *Id.* at [17].
>
> The Court views Defendant's proffered selection rationale as sufficient to carry the "extremely light" step two production burden. *Baseball at Trotwood, LLC v. Dayton Prof'l Baseball Club, LLC*, 204 F. App'x 528, 536 (6th Cir. 2006). "It is important to note that the defendant need not *prove* a nondiscriminatory reason for not [hiring Seaton], but need merely *articulate* a valid rationale." [*Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996)] (emphasis in original). To the extent Plaintiff argues that experience recency intrinsically is an illegitimate basis or a mere proxy for ageism, he is incorrect. *See Wooden v. Bd. of Educ. of Jefferson Cty., Ky.*, 931 F.2d 376, 379–80 (6th Cir. 1991) (affirming summary judgment over

plaintiff's objection to defendant's "giv[ing] more recent experience greater value"); *Killian v. Hagel*, No. 12-CV-0828 JLS (DHB), 2015 WL 13239134, at *4 (S.D. Cal. July 27, 2015) ("Plaintiff's lack of recent experience provided Defendant with a legitimate non-discriminatory reason for declining to interview and hire Plaintiff."), *aff'd sub nom. Killian v. Carter*, 672 F. App'x 677 (9th Cir. 2016).

. . . .

The cancellation explanation is also grounded in record evidence. *See, e.g.*, DE 38-3 (EEOC Hr'g Tr. – Vol. 1) at 6; *id.* at 83 ("[A]t one point we were" not even going to "have the London area office."); *id.* at 113 . . . . Indeed, some proof shows that the national RD office initially spurred the reorganization efforts. DE 22-2 at 1 (Sherie Hinton Henry Letter to all State Directors suggesting study of "Reorganizations in the Field."). Precedent supports reorganization as a valid explanation for adverse action at *McDonnell Douglas* step two. *Cf. Shah v. NXP Semiconductors USA, Inc.*, 507 F. App'x 483, 492 (6th Cir. 2012) ("Evidence of an employer's business restructuring, which may include the elimination of jobs or termination of otherwise competent employees . . . satisfies the employer's burden of producing a legitimate, non-discriminatory reason for a plaintiff's termination."). RD offers documentation of deliberate steps in consideration of the state structure under Fern's leadership. Those papered steps—which involved many players from local, to area, to state, to DC— articulate a rational basis for the sequence of and decision behind cancellation.

In sum, Defendant's stated grounds are legitimate, "clear[,] reasonably specific[,]" and they afford Seaton "a full and fair opportunity to demonstrate pretext." *Texas Dep't of Cmty. Affairs v. Burdine*, 101 S. Ct. 1089, 1096 (1981) (internal quotation marks omitted). The cases require no more.

DE 46 at 14–16.

### d. Pretext[4]

Because Defendant presents legitimate bases for the posting cancellation and ultimate hiring decisions, the burden returns to Seaton. Plaintiff had to prove that the offered reasons were, in fact, "a pretext designed to conceal unlawful discrimination."

---

[4] A pretext is "something that is put forward to conceal a true purpose or object." *Pretext, Webster's Unabridged Dictionary* (2001 ed.). It involves or features a "misleading appearance or behavior." *Id.*

*Loyd*, 766 F.3d at 590–91. Plaintiff's ultimate burden, however, was not merely to convince the Court to reject Defendant's explanation. Rather, Plaintiff had to demonstrate that if not for his age, Fern would have chosen Seaton over Turner. *See St. Mary's Honor Ctr. v. Hicks*, 113 S. Ct. 2742, 2754 (1993) ("It is not enough . . . to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." (emphasis in original)). Of the three recognized paths for proving pretext,[5] Seaton opts for the second. *See* DE 59 at 8 (noting selection of non-motivation). Thus, Plaintiff first must prove that the reorganization and any credential disparity "did not actually motivate" Fern's selection. *Loyd*, 766 F.3d at 590 (citing *Wexler*, 317 F.3d at 576).

That is, Plaintiff rightly concedes that Turner had more recent experience and closer ties to the London Area [and that Fern actually submitted a partial reorganization plan, *see* DE 56-1 at 2 (memorandum requesting reorganization approval)]. Plaintiff endeavors instead to "demonstrate that . . . 'the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup,' and did not actually motivate its action." *McDaniels v. Plymouth-Canton Cmty. Sch.*, No. 17-2412, 2018 WL 5734695, at *8 (6th Cir. Nov. 1, 2018) (citation omitted) (Title VII). The parties offer no new categories of evidence to supplement the three the Court previously identified as relevant to this question.

---

[5] At *McDonnell Douglas* step three, a plaintiff may offer proof that "(1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd*, 766 F.3d at 590 (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc)).

<u>Vacancy Cancellation</u>

First, the Court is convinced, on this record and for essentially the same reasons expressed in the summary judgment decision, that,

> [S]incere reorganization considerations did not actually motivate Fern's decision to cancel the **London** vacancy. Initially, the Court notes that the reorganization efforts never ultimately impacted the London office and that RD reannounced the vacancy less than three months after the cancellation. [DE 55-1 at 33] (January 15, 2010, cancellation letter); [DE 56-1 at 36] (April 5, 2010, reannouncement). This is far from determinative as to Fern's original motives, but—just as a closure of the London office would logically suggest sincere consideration—failure to act cuts in Plaintiff's favor. The record also includes statements from multiple current and former high-level employees that suggest moving the London office to Somerset was never a viable option. DE 22 at 96 (Former State Director Seaton); DE 38-3 at 92 (Former State Director Slone); *id.* at 66–67 (Former Acting State Director Brown); *id.* at 145 (Administrative Program Director Kostelnik). . . .

> Fern's testimony regarding acting director Brown's decision to fill a Madisonville, Kentucky, management vacancy further suggests a non-reorganization motive for the Seaton cancellation. Brown had filled the spot just before Fern arrived. Fern, as to the Madisonville selection, stated that he "felt it should not have been done" because "usually with respect and courtesy [the selecting official] will hold [management] positions . . . knowing that a new state director is going to be appointed." DE 38-4 at 5; *see also id.* at 35 (testifying to relating similar concerns to Hatcher). . . .

> More importantly, however, are Cheri Guadinier's notes from a January 2010, pre-cancellation meeting attended by Allen Hatcher, Tom Fern, Tom Kostelnik, and Michele Witt. *See* DE 23 (Guadinier Dep.) at 63[; *id.* at 59 (approximately Jan. 14, 2010)]. The relevant notes state: "Cancel them all at same time. Keep the position where it is. We are going to reannounce. . . . Document on . . . restructur[ing]." *Id.* at 69; DE 23-6 at 1. The use of "reannounce" alongside the status quo reference is telling. A reasonable and indeed obvious inference from this notation is that **prior to the cancellation** the reorganization initiators knew that any restructuring plan would not impact or displace the London area director position. . . .

> It is interesting to the Court that Fern and his group spent significant time on a cancellation-purposed call discussing Seaton as an individual candidate. The January 14 call notes from Witt (DE 27-1) and Guadinier (DE 23-6 at 1) both show this. If the cancellation decision did not personally target Seaton, why did the call involve detailed discussion of

> Seaton's "suitability issues," or his prior criminal record? In other words, if Fern acted only from a genuine and neutral desire to consider reorganization, he would have had no reason to explore a particular justification for not hiring Seaton at the time. Such imponderables signal pretext.

DE 46 at 18–20 (footnotes omitted).[6] For completeness, the Court addresses several of Defendant's briefed theories.

The defense highlights proof of discussions regarding a potential London move. *See, e.g.*, DE 63 at 3. However, such proof, given (among other evidence) the pre-cancellation fated "reannounce" note, is ultimately unhelpful to the defense. After all, the reorganization would have been a poor façade had RD, at Fern's direction, not acted to give the *appearance* of legitimate consideration. Though Defendant insists that "everything" was on the table during the reorganization talks, the London-specific proof shows that the result of any such consideration was, even before the cancellation, a foregone conclusion. The London slot withheld from Seaton would be filled. This is paradigmatic pretext. *See Jones v. Potter*, 488 F.3d 397, 408-09 (6th Cir. 2007) (labeling as "the very definition of pretext" a plan by an employer to "wait[] for a legal, legitimate reason to fortuitously materialize, and then use[] it to cover up [the] true, longstanding motivations for firing the employee").

Next, the defense argues the Slone and Seaton claims regarding reorganization legitimacy are, essentially, meaningless. *See* DE 63 at 5. The Court finds them not so easily discounted.

---

[6] The defense characterizes the Guadinier note as no more than a "tentative proposal to reannounce the position[.]" DE 63 at 8. Yet, the relevant text includes no qualifying language and is wholly affirmative. *See* DE 55-1 ("Keep the position where it is – **we are going to reannounce**." (emphasis added)).

> Seaton, as deponent, detailed the basis for his opinion that the
> reorganization, at least affecting London, was a sham. *See* DE 22 (Seaton
> Dep.) at 96 ("[T]he flow of people and the way the roads are, the network,
> how people are served that come in from the mountains to London, and
> just move them over and they got to go around the lake to get to -- over to
> Somerset, it made no sense."). Slone, a 33-year RD veteran (DE 38-3 at
> 87), also explained his (less strenuous) criticism: "Moving the London
> office to Somerset, considering how far the London office serves up into
> eastern Kentucky wouldn't be conducive to travel patterns[.]" *Id.* at 92.
> Further, the underpinnings of the Slone and Seaton opinions are consistent
> with Kostelnik's view. *See id.* at 145 ("Is it your belief that shutting down
> . . . the London office was ever a viable option . . . ? . . . . You know, we
> needed an office in that area.").

DE 46 at 18 n.10. The opinion of two former State Directors is surely weightier than the

typical subjective views of a spurned applicant. That said, Defendant does raise one valid

criticism of the Slone and Seaton statements—namely, the fact that neither was an RD

employee during the relevant period. *See* DE 63 at 5. Thus, neither had direct knowledge

of whether **Fern** legitimately considered the move. Yet, circumstantial impact of the

former Directors' views persists. Further, the fact that then-current RD decisionmakers

ultimately reached the same conclusion that Seaton and Slone espoused, relative to

London, sharply undercuts the idea that their opinions were no better than sour-grapes

conjecture.[7]

In short, Plaintiff has proven that reorganization was a pretext for the cancellation

and Defendant offers no compelling contrary claim. That said, the vacancy cancellation is

not, here, an independently actionable event. Seaton also needed to prove that Fern was

---

[7] Perhaps a better, but related critique is that both Seaton and Slone had not been
employed at RD for some time. Both may have missed internal changed circumstances
that potentially justified a fresh look at RD's London-area structure. Yet, no RD
employee testified to any compelling basis for an actual London office move or closure.
[Fern's thin rationale was, evidently, shot down by RD's own reorganization committee.
DE 38-4 at 7.] The defense's reliance on generalities, as to consideration and motivation
for the London move, is telling.

dishonest when describing his motives for, months later, selecting Turner. Though, "the proof suggesting ulterior cancellation motives carries consequential weight for the later decision." DE 46 at 21. That is, Fern's disingenuous reliance on the restructuring explanation leads to general doubts regarding his overall credibility and specific doubts about the veracity of his claimed reliance on Turner-favorable factors in making the final selection.

In sum, the Court, on the full record, is convinced that legitimate consideration of a London office move or closure did not motivate Fern's cancellation decision, and the vacancy-related proof provides a strong foundation for Seaton's overall pretext case.

<u>February 12, 2010 - Meeting Notes</u>

Next, Cheri Guadinier's February 12, 2010, teleconference notes include clear indications of prejudgment regarding Seaton's candidacy. During the call, a high-level RD employee, DE 23 at 82, stated that Seaton would "re-apply for the position [and] not [be] selected[.]" DE 23-6 at 7. From this, the Court notes several Plaintiff-favorable inferences:

> First, the implicit suggestion—post-cancellation, but amidst "analysis of the reorganization plan" (DE 23-6 at 7)—that the same position was going to be reposted (this, of course, from a natural reading of *re*-apply) adds to doubts about the proffered cancellation motive. Second, the conference, mid-process, provides a temporal guidepost connecting the cancellation and ultimate selection.

DE 46 at 22. That is, this additional link in Plaintiff's narrative chain adds confirming weight to the Court's doubts (springing from the cancellation) about the Turner-pick explanation. Third, the statement independently discredits Fern's explanation for his final selection.

> Fern testified at length about how he evaluated Seaton *in comparison to* Turner. DE 38-4 at 13–24. He further claimed to have considered Seaton's application as selecting official and, indeed, convened a committee specifically for that purpose. *Id.* at 42–43. Yet, despite testifying that June 2010 was the "first time [he] had occasion to compare Mr. Seaton directly to Mr. Turner[,]" the Guadinier notes suggest that such comparison was, at best, a nullity and, [in the Court's view], a total ruse. DE 38-3 at 153–54.

DE 46 at 22 (footnote omitted). Per the testimony, the statement reflected in Guadinier's notes would have, to Ms. Witt, RD's Civil Rights Manager, raised "red flags,". *See* DE 27 (Witt Dep.) at 55. The Court reacts similarly.

The post-cancellation notes indicate that the team on the call knew Seaton would reapply, knew Seaton would not be selected, and knew Seaton would "argue an EEO basis" after his non-selection. *See* DE 23-6 at 7; DE 38-3 at 106 (Guadinier confirming that her notes indicate "they're not going to select" Seaton if he reapplied). Of course, all of this ultimately came to pass. Fern, having already rescinded the prior pick, knew he would never select Seaton. Thus, his purported comparisons of Seaton and Turner's credentials were a mere mise-en-scène.

Additionally,

> [T]he February 12 notes reflect a Fern inquiry regarding recusal and/or delegating the selection process. Hatcher advised that it could be done but it would be "irregular[.]" DE 23-6 at 7. Typically, idiosyncrasies in the selection process are a plaintiff-favorable factor in the pretext analysis. *Jenkins v. Nashville Pub. Radio*, 106 F. App'x 991, 995 (6th Cir. 2004) (holding that the plaintiff had raised a triable issue as to pretext based, in part, on "evidence of irregularities in the application and selection process").

DE 46 at 23. Though Fern did not ultimately recuse or delegate the selection decision, the inquiry shows implicit acknowledgment of legitimate reasons to question his impartiality.

In short, the Court does not buy Fern's tales regarding cancellation, on January 15, or legitimate Seaton consideration, on February 12.

The defense contends that Seaton's credential disparity claims rely entirely on his (and his friend, Slone's) opinions. DE 63 at 17. The Court, for the following reasons, disagrees: (1) Fern himself testified that Seaton's educational experience was clearly superior to Turner's. DE 38-4 at 30; (2) Seaton previously served 6 years as State Director and 2 years as a tri-county supervisor at RD's predecessor agency. DE 56-1 at 20 (Seaton Resume); (3) Turner had never served (in a non-acting capacity) in a managerial position broader than the county level. *See* DE 55-1 at 54. [Former Director Slone testified that supervisory experience is "70 percent of what" an Area Director does and "the number one criteria." DE 28-3 at 88, 90.]; (4) RD personnel, scoring both applicants (along with several others) using objective criteria, initially ranked Seaton (tied for) first and Turner (tied for) last. DE 55-1 at 41–42; (5) the first selection committee, evaluating Seaton and Turner on the same Certificate of Eligibles, unanimously found Seaton most qualified, or at least the group's favored candidate, and recommended Brown pick him. DE 38-3 at 68–69.

On comparison of the resumes, non-recency/locality factors objectively favor Seaton.[8] Though, the gap is not enormous and Brown, the original selector, acknowledged that reasonable minds could differ regarding his choice of Seaton. DE 38-3 at 69. The Court, however, sees enough for Seaton to clear the pretext hurdle on Fern's hiring explanation:

---

[8] Further, while the defense insists that experience recency was the linchpin for the Turner pick, Fern (the selector), prior to his appointment, had not worked at RD for nearly a decade. DE 38-4 at 4. This logically diminishes the creditability of Fern's principal Seaton resume critique.

> A higher rating on objective criteria, a unanimous committee naming him most qualified from a list that included the ultimate selectee, the Fern-acknowledged gap in education, and the relative disparity in high-level management experience combine to offer a [sufficient] springboard for a pretext inference. *See Burdine*, 101 S. Ct. at 1097 ("The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination.").

DE 46 at 25 (footnote omitted). Finally, the Court notes that when Fern made his initial selection, (though through no fault of his own) he did so without Seaton appearing as an eligible candidate. DE 38-3 at 134 (Kostelnik EEOC testimony). Despite knowledge of Seaton's interest, and prior selection, Fern chose Turner without Seaton in the mix. Though Fern later utilized a concurrence committee for approval, he repeatedly testified that he had "already" decided on Turner. DE 38-3 at 153; DE 38-4 at 12, 42. That was true. This too, is proof that Fern made his choice without the comparative consideration the defense offers to justify the ultimate Turner pick. In short, the Court, with ample record support, rejects Fern's stated rationale for tapping Turner over Seaton.

   *e. Fern's Credibility & Pretext Sub-Conclusion*

If Fern had been honest from the jump, the pretext question would be a closer call. However, the Court finds that Fern, on this record, was decidedly <u>dis</u>honest about the sequence and process.

As discussed, Fern's cancellation and hiring narratives are impeached by and conflict with copious record proof. Fern's direct dissembling with Seaton further damages his credibility. Per Plaintiff, as he began to develop insecurity and heard that Fern, new on the job, might be meddling with the selection, Seaton went to meet with Fern. In this awkward exchange, weeks before cancellation, Fern led Seaton to believe

that his application was mid-process and that Fern would have no role in hiring completion: "And he basically told me that he was not going to get involved in the process, that I was already involved in getting it processed, and that personnel had already started dealing with me. . . and for me to work with them, but he was not going to get involved in the process." DE 22 at 59–60. Given actual events—Fern had seized on the reorganization, initiated cancellation of the selection, and indeed ultimately was Turner's selector—this, credibly reported, darkling, exchange shows blatant deceit by the subject decisionmaker.[9]

Fern's withholding at the EEOC hearing adds to the picture. For instance, Fern repeatedly refused to credit any of Seaton's significant credentials. ALJ Momah's comments during this portion of Fern's testimony are noteworthy. *See* DE 38-4 at 29 ("[T]here's certain things that you're saying that makes my skin crawl."). This was not the first time that Judge Momah questioned Fern's forthrightness. *See* DE 38-4 at 10 (suggesting Fern was not a "straight shooter" and, perhaps, was trying to "play mind games"). At the hearing, Fern, initially, did everything but explicitly admit that RD's nationwide reorganization authorization presented a chance opening for him to expunge non-final selections made prior to his arrival and pick his own candidates. *See* DE 38-4 at 4, 6 ("I had the opportunity to cancel those positions[.]"). Of course, this did not stop him from ultimately insisting that London-specific reorganization intent was the true

---

[9] Defendant's limp rejoinder, that Fern was not "involved in Seaton's background check or any of the nuts and bolts of personnel operations regarding Seaton[,]" DE 63 at 12, misses the point. Seaton never claimed that Fern offered him a qualified assurance of non-involvement in background checks or on-boarding minutiae. Rather, per Seaton, Fern said he was not going to get involved in the process whatsoever. The Court finds Seaton's report credible. Thus, Fern's subsequent push for cancellation prove his prior statement false.

cancellation driver. Here, an independent factfinder had the opportunity to eyeball Fern as he testified. Judge Momah found Fern, on several topics, incredible. *See, e.g.*, DE 38-5 at 11. That finding, for this Court, is hardly determinative. However, a neutral jurist's adverse read on Fern's live testimony is certainly confirming as to the Court's paper-record conclusions regarding witness verity.

In sum, the record paints Fern as, at least on the topic and details of this hiring process, dishonest. This finding is, as to the Turner pick, critical. Turner was surely qualified for the job. *See* DE 38-3 (Brown EEOC Testimony: "[A]ny of the candidates could have done the job."). RD twice rated him as such. *See Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987) ("So long as its reasons are not discriminatory, an employer is free to choose among qualified candidates."). The qualifications gap is no wide gulf and, again, experience recency is surely a legitimate factor. Yet, Fern's dishonesty regarding reorganization (and direct lie to Seaton) plant seeds of doubt, and obligate the Court to examine his selection explanation (itself circumstantially subject to question) through a doubtful lens.

Fern conducted a fetid process. *See* DE 38-5 at 25 (finding meeting discussions "very disturbing"). He lied, created dubitable procedural cover, and ultimately selected a significantly younger candidate that once had been tied as the lowest-rated qualifying applicant. The first two influence the Court's view of the last, and drive the ultimate pretext finding. That is, the Court finds that Fern relied on a convenient excuse (reorganization) to cover his real motives for the posting cancellation and, to justify the Turner pick, ignored the areas of Seaton's superior qualifications and simply pointed to

other narrower grounds where Plaintiff was fortuitously deficient. In short, Fern's explanations for denying Seaton were pretextual.

### f. Ultimate Burden

Beyond the prima facie case,

> the record analyzed thus far includes little to point the finger at an ageist motive. Further, "[t]he isolated fact that a younger person eventually replaces an older employee is not enough to permit a rebuttal inference that the replacement was motivated by age discrimination." *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 267 (6th Cir. 1986).

DE 46 at 26. And, though rejection of RD's proffered explanations *permits* the Court "to infer the ultimate fact of intentional discrimination[,]" Seaton still needed to convince the Court that age discrimination was Fern's true motive. *St. Mary's Honor Center*, 113 S. Ct. at 2749, 2754. The Court, for the reasons detailed below, concludes that Seaton failed to prove that age was the but-for cause for his non-selection.

In Seaton's ledger is the prima facie case and the strong pretext proof. To this, Seaton seeks to add his interpretation of two other pieces of record proof. First, Michele Witt's January 14, 2010, meeting notes:

> From this pre-cancellation teleconference involving Hatcher, Fern, Kostelnik, and Guadinier, Witt recorded: "Age Disc. = 40 yrs." DE 27-1. . . . When asked, at the EEOC hearing, if this note indicated that part of the meeting discussion concerned whether there was "a potential age discrimination issue[,]" Witt testified: "Apparently so or I wouldn't have written that, because that's just my mental note of what age discrimination equals." DE 38-3 at 76; *see also id.* at 80 ("[I]f I wrote that down, obviously someone just mentioned age discrimination[.]").

DE 46 at 28–29. Seaton argues that the Witt note constitutes "a signal that age was a primary consideration for what was truly motivating Defendant." DE 64 at 7.[10] The Court for several reasons, does not buy the interpretation.

Consider the involved parties: Cheri Guadinier, Allen Hatcher, Tom Fern, Tom Kostelnik, and Michele Witt. One, Kostelnik, was on the committee that originally (and unanimously) selected Seaton. *See* DE 38-1 at 4; *cf. Wexler*, 317 F.3d at 573 ("[A] court may infer an absence of discrimination where the same individual hired and fired the plaintiff[.]"). Another, Hatcher, was RD's *national* Director of Human Resources. The relevant note-taker, Witt, was RD's **Civil Rights** Manager. DE 27 (Dep.) at 9. The idea that such RD personnel would be frankly, perhaps blithely, discussing a scheme to cover up age discrimination, while allowing a civil rights compliance officer to record the fact, is, at best, very improbable. *See also* DE 22-6 (Seaton EEOC Resp. – "[T]he only people I have reservations about in this entire matter are Mr. Kostelnik and Mr. Fern.").[11]

The far more reasonable explanation, and the one the Court adopts, is that RD, aware that the cancellation would likely raise a stink—given Seaton's consistent zealous involvement in the process—was, so to speak, covering its bases. The note, itself, is a vanilla statement of the law, and "the legislative history of the [ADEA] counsels against reading the statute as forbidding any consideration of age under any circumstances[.]" *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). Surely Congress did not intend to bar consideration or mention of the very strictures it

---

[10] It is notable that Plaintiff, with his last words in the case, argues (at least with regard to interpretation of the Witt note) only that age was "a[,]" not **the** principal consideration for the hiring choice. *See id.*

[11] *See* DE 38-5 (ALJ Momah doubting "that on any particular occasion that the ADEA is mentioned, it is [ ] because a group of management figures are fiendishly plotting how they can break the law and get away with it").

implemented for purposes of **compliance**. The individuals involved with the relevant meeting, at least those with record testimony, explicitly disavow any improper discussions. At bottom, the Court is simply unconvinced that the Witt note constitutes proof of any nefarious discussion and, thus, views it as unhelpful to Seaton's attempt to prove ageist motive. *See* DE 38-5 at 27 (Judge Momah described the idea that "Ms. Witt's notes have anything to do with discriminatory intent" as "wildly unlikely[.]"). The Court expects any employer, dealing with a protected applicant, to vet job action legality as part of a diligent decision.

Next, the Court considers Kostelnik's attributed remarks:

> Kostelnik was the administrative program director and was working closely with Fern on re-doing the selection. He had a handle on Fern's views, DE 38-3 at 138 ("Mr. Fern . . . felt that . . . recentness of experience was an important characteristic[.]"), and allegedly relayed directly to Seaton that he was "out of touch" and "out of date[.]" DE 22 at 75 (Seaton attributing such remarks to Kostelnik).

DE 46 at 29 n.19. The Court, on summary judgment review, noted potential pernicious and innocuous counter inferences from these statements. *See id.* On the full record, and acting as factfinder, the Court views the Kostelnik statements as reflecting a legitimate negative view of dated experience. The statements are consistent with Fern's reported preference for more recent experience. Given that Fern is actually 6 years older than

Seaton,[12] among other reasons, the Court rejects an interpretation of Kostelnik's words as parroting an ageist tilt from RD's apex.[13]

> Plaintiff's counsel, in closing argument at the EEOC hearing, provided an interpretation of the alleged "20 years out of date" remark that is consistent with the Court's view, *i.e.*, that criticism of remote experience is just that. DE 38-4 (EEOC Hr'g Tr. – Vol. 2) at 57 ("[B]asically it meant that Mr. Seaton's . . . experiences . . . w[ere] too far in the past."). Put simply, age and age of experience, though often correlated, are hardly synonymous.[8] If Fern chose Turner because he honestly believed Seaton's experience "was too far in the past[,]" then Seaton's claim fails. *Browning v. Dep't of Army*, 436 F.3d 692, 696 (6th Cir. 2006) ("[E]mployment-discrimination laws do not diminish lawful traditional management prerogatives in choosing among qualified candidates, and an employer has great flexibility in choosing a management-level employee." (internal citations and quotation marks omitted)).

>> [FN 8: For example, a 38-year old individual (not protected by the ADEA) could have lifeguarding experience "20 years out of date." On the flipside, Mr. Brown's experience from his 40+ continuous years at the USDA (DE 38-3 at 65) was, as of the EEOC hearing, current despite falling within the ADEA's protective ambit.]

---

[12] The Court, on Rule 56 consideration, declined invocation of a "same-group" inference, *i.e.*, "the idea that one member of a group is unlikely to discriminate against another member of the same group." *Wexler*, 317 F.3d at 574. However, precedent indicating that it would be error to do otherwise "at the summary judgment stage[,]" compelled the ruling. *See id.* This matter has proceeded to the trial stage and, here, the Court finds the relative age of the purported ageist, though only a minor factor, relevant. Logically, a hirer older than a potential employee is less likely to rely improperly on age as grounds for finding the candidate unfit (particularly so, where, as here, the subject position is within, but lower within, the hierarchy of the elder selector's current role).

[13] The Court previously declined:

> [Reliance] on Fern's alleged cancellation, nearly two decades prior to the relevant period, of a Rural Utilities Director position after a preferred candidate was selected. The Court is skeptical of the allegation's relevance given the absence of any ageist component and the temporal distance from the 2009-10 events. *Cf. McGrath v. Lockheed Martin Corp.*, 48 F. App'x 543, 553 (6th Cir. 2002) (rejecting plaintiff's "attempt to demonstrate a conflict in the reasons given for his layoff" based, in part, on statements "temporally remote from the challenged . . . layoff decision.").

DE 46 at 32 n.20. The Court further saw "no reason . . . to conclusively determine the evidence's admissibility for trial purposes." *Id.* Plaintiff does not rely on such proof at this stage and the Court, though accepting the parties' agreed record, finds no probative force in such distant, disparate events.

DE 46 at 15. "Employers may not consider an employee's age for its own sake, but the ADEA does not prohibit them from considering other factors that correlate with age." *Rowan*, 360 F.3d at 548. Ultimately, Kostelnik's statements support what is a mostly undisputed fact. Fern perceived that Seaton's experience was too old. If that factor, though linked with Seaton's age, drove the Turner pick, there was no age discrimination here.

Thus, the Court views Seaton as in principally the same position he was at the close of the pretext analysis. He has proven a prima facie case and shown that Fern lied about why he cancelled the vacancy cancellation and at least the manner by which he ultimately chose Turner. The Court, in the specific case circumstances, finds this insufficient for Judgment in Seaton's favor.[14]

Seaton, who knows Fern from and indeed once supervised Fern during his prior tenure with RD, surely had insight into the real motivations of the man. His claimed decisional basis was uneven and only tangentially or lastly reliant on age. "[M]uch of the evidence most damaging to [Seaton's] allegations comes from h[is] own testimony." *Hartsel*, 87 F.3d at 800. Seaton repeatedly raised **politics** as the principal driver for

---

[14] District courts may, in appropriate circumstances, grant summary judgment in the face of a valid prima facie case and pretext showing. *Alberty v. Columbus Twp.*, 730 F. App'x 352, 359 (6th Cir. 2018). Thus, the *McDonnell Douglas* results are surely not binding, as to the ultimate discrimination question, for a court, as here, acting as factfinder. The Court discussed the pretext-only law at length in the summary judgment decision. *See* DE 46 at 26–28.

Fern's choices.[15] *See, e.g.*, DE 38-3 at 34 ("I think it's politics."); *id.* at 36 ("[T]he reason

. . . why Mr. Fern did not select me is because he had decided that he didn't want a

Republican person working for him[.]"). Seaton also testified that his prior supervisory

role over Fern may have played a role. DE 38-3 at 36 ("[H]e didn't want to be reminded

of me being a former state director and be a district director reporting to him and working

for him[.]"); *see also* DE 22-5 (EEOC Compl. identifying, as a discrimination issue, that

Seaton "served as Mr. Fern's supervisor (State Director) previously"). Alternatively,

Seaton suggested that Fern may have simply wanted Turner from the start. *Id.* ("[H]e had

talked to a few people and had told them that he had somebody else in mind[.]"); DE 1-1

(Seaton, at the EEOC, argued "that the State Director wanted to hire 'his guy' and did not

want to have" a former state director working under him.).[16] Finally, Seaton indicated

that Fern may have developed a negative view of Plaintiff's management style while

working under him during Seaton's directorship. *See* DE 38-3 at 34–35 (Seaton testifying

that he and Fern "had some friction from time to time" and that "over the years it became

clear to me that he didn't like me because he thought I was a little too hard.").

The Court sees other explanations. For instance, Seaton's ignominious departure

from the Agency after a federal indictment and conviction. Also, Fern's statements

regarding the completed Madisonville hiring suggest that the cancellation may have been

motivated by a desire to interdict a similar perceived slight in the form of Brown's Seaton

---

[15] Seaton's EEOC filings further highlight the primacy of politics in Plaintiff's
understanding of the hiring decision (at least until he learned that such a claim lacked
viability). DE 22-5 (EEOC Compl. listing "assumed political beliefs" as the first of
Seaton's "Issue(s) of Alleged Discrimination"); DE 22-6 (Seaton EEOC Resp. – "The
whole process was contrived to discriminate against me so as to employ a politically
aligned person.").
[16] Preselection, absent ageist motive, is not ADEA actionable. *See Goostree v. Tennessee*,
796 F.2d 854, 861 (6th Cir. 1986).

selection.[17] *See* DE 38-4 at 5 ("[U]sually with respect and courtesy [the selecting official] will hold [management] positions . . . knowing that a new state director is going to be appointed."). The common thread running through each of these disparate explanations is the absence of an ageist component.

Ultimately, the Court need not find what Fern's true motivation was. Rather, the Court's task is to decide if Seaton proved that age was the but-for causal driver for his non-selection. The existence of other equally—indeed, on this record, more likely— explanations serves only to highlight Seaton's failure to preponderantly point the finger at age. The individuals involved in the process all categorically deny that age played any role. And Seaton, proceeding circumstantially, failed to provide an evidentiary platform from which to make the necessary inferential leap. Instead, his own testimony is that a host of non-ageist factors drove Fern's choice. *See* DE 38-5 at 30 ("Taking Mr. Seaton's testimony as a whole, the one thing that stands out is that . . . he hardly mentioned age except when . . . he was directly led to do so by his own attorney.").

Fern was certainly covering up something, but, to this factfinder, no proof in the record says it was ageism. Seaton in his own descriptions of the reasons why Fern chose Turner—at his deposition, at the EEOC hearing, in his sworn EEOC response—mentions age as either a postscript or not at all. The Court does not believe that, if not for Seaton's age, he would have gotten the job. In truth, and despite RD's dodgy process, the Court does not see preponderant evidence that age was even **a factor** in Fern's selection

---

[17] Bolstering the idea that the Madisonville-related testimony represents a possible motive for Fern is a July 23, 2009, cancellation letter regarding an initial (pre-selection) posting. *See* DE 55-1 at 26. It appears, from this document, that RD's original intent (and perhaps standard practice) was to not fill vacancies in the absence of a permanent State Director. *See id.* RD ultimately forged on, but the die was not cast on Seaton when Fern assumed control.

decision. Seaton, here, faced the burden of proving a but-for discriminatory cause. The Court finds that he failed.

## IV.    CONCLUSION

Despite Fern's incredible testimony, there is simply no competent, persuasive proof as to age-based animus, much less of age as **the** driving force behind Fern's pick. On this record, age was, as to Seaton's litigation strategy, an afterthought and, as to Fern's hiring choices, considered only for purposes of compliance. The Court finds that Seaton has not proven, by a preponderance of the evidence, that age was the but-for cause of his non-selection as Area Director. As Fern admitted at the admin hearing, when he knew the reorganization carrot dangled as an excuse to cancel: "[I]f I have this opportunity [to cancel the open slots, including London] . . . I'm going to do that." DE 38-3 at 152. Fern wanted determinative say in the selection. Whether actually because of Fern's past experiences with or knowledge of Seaton, a desire for his own "guy" in the AD role, his uber-favorable impression of Turner, or his view of experiential recency or geographic connections, Seaton surely was not the person Fern wanted. The Court finds, simply, that it is **not** more likely than not true that Fern's but-for motivation was Seaton's age. The statute addresses intentional age discrimination, and Fern did not prove that RD intentionally discriminated on that basis. Therefore, Defendant is entitled to judgment. The Court so finds and concludes, on the specifics stated in this Opinion & Order.

For all these reasons, the Court **FINDS** in favor of Defendant Sonny Perdue. The Court will enter a separate Judgment consistent with this ruling.

This the 30th day of September, 2019.



Signed By:

_Robert E. Wier_

**United States District Judge**